[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
Defendant-appellant James Moore appeals from his conviction and sentence for Menacing by Stalking. Moore contends that the evidence is insufficient to establish, beyond reasonable doubt, that he placed his victim in fear that he would cause physical harm to her, an element of the offense. From our review of the record, we conclude that there is sufficient evidence in the record to support the conviction. Accordingly, the judgment of the trial court is Affirmed.
 I
Moore was charged as a result of six alleged incidents, all in early 1996, involving himself and his alleged victim, Denise Smith, who was then thirteen years old. Moore and Smith lived directly across from one another at the time of the alleged incidents.
In his brief, Moore describes these incidents as follows:
The first incident that the complainant testified about occurred, according to complainant on January 24, 1996. The complainant, who was at the time a student at St. Anthony's Catholic School on Wyoming Street, Dayton, Ohio, was a safety patrol person. The Complainant indicated that on this day the appellant parked in the parking lot of the library which is across the street from her patrol post. The complainant indicated that Mr. Moore stayed in his car, and was "calling me a whore and flipping me off and laughing and stuff like that . . ." The complainant testified that this incident "kind of made me nervous because it was just me and the other crossing guard there; but he usually knows how far to go. I don't think he would try anything at that point. I was just a little scared. I went in and told the principal and stuff."
The second incident that the City of Dayton relied upon to attempt to prove a violation of O.R.C. § 2903.211 supposedly occurred on January 26, 1996. The complainant indicated that on this day at approximately 7:30 a.m. the Appellant "was in his car, going up and down the street, watching. He was going by the house. He went up and down about three or four times, just watching." The Complainant further testified that the Appellant "would look and stare and laugh." The Complainant in response to the question did the incident place you in fear responded "Yes."
The third alleged incident relied upon by the City of Dayton supposedly occurred on February 24, 1996. This incident occurred at approximately 4:30 p.m. The Complainant indicated during her testimony that while the Complainant and a friend walked from Complainant's home to the friend's home Mr. Moore, who was in his automobile, stopped at a corner and waited for the Complainant and her friend to reach the corner. The Complainant further indicated that when she and her friend arrived at the corner that the Appellant rolled down his window and called the girls "whores and bitches and was flipping me off and saying, `fuck you,' and was grabbing himself and things like that . . ." Appellant did not get out of his car, and his car door did not open. The Complainant did not testify that this incident caused her any fear.
The fourth incident relied upon by the City of Dayton allegedly occurred on March 15, 1996. The Complainant alleges that on this date Appellant came out to the curb area where Complainant was present with her sister and a friend. Complainant testified that Mr. Moore "grabbed his butt, in the back. Then he turned around and grabbed his front and shook it, and this was in front of my sister and friend." The Complainant indicated that she was "disgusted" by Mr. Moore's action.
The next incident relief upon by the City of Dayton supposedly occurred on April 22, 1996. The Complainant indicated that she was once again with her friend, Hillary, when this incident occurred. The Complainant indicated that she was riding her bike on this date. The Complainant indicated that the Appellant called Complainant and her friend "bitches and stuff like that . . ." The Complainant also testified that Mr. Moore said `fuck you,' and a whole bunch of other things like that . . ." The Complainant indicated that this activity occurred while Mr. Moore remained in his automobile.
The final incident relied upon by the City of Dayton, the exact date of which is not clear from the record, involved an incident where the Complainant, allegedly, was waiting for a ride to a soccer game, she observed Mr. Moore "grabbing himself and shaking it; and as soon as they came, he went in the house . . ." The Complainant indicated that this incident made her "real scared . . ."
Moore testified in his own behalf, denying that these incidents occurred as alleged. The trial court found Moore guilty as charged, and imposed an appropriate sentence. From his conviction and sentence, Moore appeals.
 II
Moore's sole Assignment of Error is as follows:
 THE LOWER COURT ERRED IN REACHING THE CONCLUSION THAT THE CITY OF DAYTON PROVED APPELLANT'S GUILT OF A VIOLATION OF O.R.C. § 2903.211 BY PROOF BEYOND A REASONABLE DOUBT BECAUSE THE CITY OF DAYTON FAILED TO ESTABLISH, BY THE REQUISITE DEGREE OF PROOF, THAT WHATEVER ACTIVITY APPELLANT ENGAGED IN PLACED THE COMPLAINANT IN FEAR THAT APPELLANT WOULD CAUSE PHYSICAL HARM TO HER.
R.C. 2903.211 proscribes the offense of Menacing by Stalking, as follows:
 No person by engaging in a pattern of conduct shall knowingly cause another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person.
The City of Dayton did not allege that Moore caused the type of mental distress required by this statute. Accordingly, the City was required to prove beyond a reasonable doubt that Moore's activities caused Smith to believe that Moore would cause her physical harm.
We conclude that there is sufficient evidence in the record to support a finding that Moore's alleged conduct caused Smith to fear that he would physically harm her. This includes the following testimony of Smith's mother, Karen Smith:
 Q. Have you seen her reaction to this type of conduct?
A. Yes.
 Q. Can you describe how this conduct has made her act?
A. Very upset; both of them.
Q. What does that mean.
 A. Crying. She says, "He is going to get me. He is going to get me. He is scaring me. . . . He is going to hurt me."
 Q. And how long has this type of conduct been going on towards your daughter?
A. Probably since January.
Q. January of `96?
A. Yes.
 The record also includes the following testimony of the alleged victim, Denise Smith:
 Q. What did you see him do, in relation to what you guys were doing in the car?
A. Just flipping us off. That's about it.
 Q. So when you were in the car, was he directly behind you?
A. Yes, he was.
 Q. And you saw him giving you the finger; is that what you call flipping off?
A. Yes.
 Q. And did he drive in a different direction than the car that you were riding in?
A. No.
 Q. Did he take the same path that your car was taking?
A. Yes, he did.
Q. Until you got to the school?
A. Right.
* * *
 Q. How did you feel, when he was watching you and doing these things to you?
 A. It kind of made me nervous because it was just me and the other crossing guard there; but he usually knows how far to go. I didn't think he would try anything at that point. I was just a little scared. I went in and told the principal and stuff.
 Q. You were scared and nervous; is that what you are saying?
A. Yes.
* * *
 Q. Now do you also recall an incident that happened on January 26, 1996, at your home, involving Mr. Moore?
A. Yes.
Q. What happened on that day?
 A. I was waiting for a ride. I recall him going up and down the street a couple of times in his car, watching to see if my ride came.
* * *
 Q. First of all, approximately what time of day was this?
A. About 7:30.
 Q. So this is when you are getting ready to go to school?
A. Yes.
Q. Where were you, at this time?
A. I was in the front door, again.
Q. And what did you see him doing?
 A. He was in his car, going up and down the street, watching. He was going by the house. He went up and down about three or four times, just watching.
 Q. When he drove up and down the street, what, if anything, did he do when he got to your house?
A. He would look and stare and laugh.
 Q. How would you describe the driving that he was doing? Was he speeding down the street, driving slowly, parking or whatever?
 A. He would speed up; and then when he got to my house, he would slow down, turn in the alley, and go back up. Then he would speed back down.
Q. How many times did you see him do this?
A. About three or four times.
Q. How did you feel, when you saw him doing this?
 A. I felt that the incident that had happened two days earlier was going to happen again.
Q. And did that place you in fear?
A. Yes.
 Q. Do you recall an incident that happened on February 24, 1996, involving you and your friend, Hilary?
A. Yes, I do.
Q. Tell the Court what happened.
 A. Hilary lives around the block, to the next corner. We walked around to her house. Mr. Moore stopped at the alley. He stopped at the corner and waited for us to get there. When we did get up there, he rolled down his window and called us whores and bitches and was flipping me off and saying, "Fuck you," and was grabbing himself and things like that.
Q. What time of day was this?
A. About four or 4:30.
Q. In the afternoon?
A. Yes.
 Q. So if you are leaving from your house to walk to Hilary's house, are you on the public street; or where are you?
A. I was on the corner of King Avenue.
Q. And you saw him where?
 A. He came out of the alley on King and stopped at the corner of King and Watervliet. He waited for us to walk up there. He had chances to turn, but he didn't.
Q. How would you describe the stop that you saw?
 A. He slammed on his brakes, really hard, so we would look over there.
Q. How did this make you feel?
 A. I felt scared. I thought he would do something to me.
* * *
Q. Did you continue walking in that direction?
A. Yes.
Q. How close did you get to Mr. Moore?
A. From his car?
Q. Yes.
A I was about five feet away.
Q. And did he leave?
A. Yes; after we walked up the street.
 Q. So when you walked by him, did you say anything to him?
A. No, I didn't.
Q. Did he say anything to you, at that point?
A. Yes, he did.
Q. What did he say.
 A. He just said, "You are a fucking bitch. I am going to come and get you."
Q. Did he make any movements towards you?
A. No; not at that time.
* * *
 Q. Have there been any other incidents in which Mr. Moore grabs his crotch, in your presence?
A. Yes.
Q. What happened?
 A. He stood out in front of his stairs, so I could see. I was waiting for a ride to the soccer game. He was out there grabbing himself and shaking it; and as soon as they came, he went in the house. I was the only person who saw it. I was the only person at home, at that time.
Q. How did that make you feel?
 A. I was real scared because I was the only person home. I didn't see any of my neighbors home or anything. He was the only one I saw home, at that time.
 Q. Each of the incidents that you have just described — January 24, January 26, March 15, April 22, and April 24 — you reported each of those incidents to your parents; is that correct?
A. Yes, I did.
 Q. And you reported those incidents to the police; is that correct?
A. My parents did.
Q. And did you tell your parents that you are afraid?
A. Yes, I did.
 Q. Are you afraid to go outside of your house because of Mr. Moore?
A. Yes, I am.
* * *
 Q. Between January of `96 and April of `96, what other incidents — other than the ones that you have talked about — what other incidents or conduct do you recall happening between you and Mr. Moore?
 A. Just things that he does every day, like calling me a bitch and giving me the finger and saying, "Fuck you." I don't like to hear this every day, when I walk out of my front door.
* * *
 Q. Based on this activity, you said that you have been afraid?
A. Yes.
 Q. Did you believe that there would be some physical harm to you?
A. Yes, I did.
The testimony of the alleged victim, Denise Smith, if believed, would persuade the average mind, beyond reasonable doubt, that Moore engaged in a pattern of conduct that he knew, or should have known, would cause Smith to believe that Moore was going to cause physical harm to her. The cumulative effect of the alleged incidents involving Moore, including the alleged incident of February 24, 1996, when, according to Smith, Moore said to her, "You are a fucking bitch. I am going to come and get you," was sufficient to put Smith in fear that Moore would physically harm her, and a reasonable person in Moore's position would know that.
Moore's sole Assignment of Error is overruled.
 III
Moore's sole Assignment of Error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and GRADY, JJ., concur.
Copies mailed to:
Deirdre Logan
Michael L. Tucker
Hon. Bill C. Littlejohn